**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard, 16ᵗʰ Floor
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SUPER 8 WORLDWIDE, INC., formerly known as SUPER 8 MOTELS, INC., a South Dakota Corporation, | : : : | Civil Action No. 16- |
| Plaintiff, | : | **VERIFIED COMPLAINT** |
| v. | : : | |
| JAGDISH P. PATEL, an individual; and HANSA C. PATEL, an individual, | : : : | |
| Defendants. | : | |

Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., by its attorneys, LeClairRyan, complaining of defendants Jagdish P. Patel and Hansa C. Patel, says:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., ("SWI"), is a corporation organized and existing under the laws of the State of South Dakota, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Jagdish P. Patel ("J. Patel"), on information and belief, is a citizen of the State of California, having an address at 918 East Lacey Boulevard, Hanford, California 93230.

3.     Defendant Hansa C. Patel ("H. Patel"), on information and belief, is a citizen of the State of California, having an address at 918 East Lacey Boulevard, Hanford, California 93230.

4.     The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

6.     This Court has personal jurisdiction over J. Patel and H. Patel by virtue of, among other things, section 17.6.3 of the August 14, 2007 franchise agreement by and between J. Patel and H. Patel and SWI (the "Franchise Agreement"), described in more detail below, pursuant to which J. Patel and H. Patel have consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

7.     Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by J. Patel and H. Patel of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Super 8® Marks

8.     SWI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

9.     SWI owns and has the exclusive right to license the use of the service mark SUPER 8® and various related trade names, trademarks and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and

derivations thereof (the "Super 8® Marks"), as well as the distinctive Super 8® System, which provides guest lodging services to the public under the Super 8® name and certain services to its franchisees, including a centralized reservation system, advertising, publicity, and training services.

10.     SWI or its predecessors first used the SUPER 8 MOTEL mark in 1973 the Super 8® Marks are in full force and effect.  Certain of the registered Super 8® Marks are incontestable pursuant to 15 U.S.C. § 1065.

11.     SWI has given notice to the public of the registration of the Super 8® Marks as provided in 15 U.S.C. § 1111.

12.     SWI uses or has used the Super 8® Marks as abbreviations of its brand name.

13.     Through its franchise system, SWI markets, promotes, and provides services to its guest lodging franchisees throughout the United States.  In order to identify the origin of their guest lodging services, SWI allows its franchisees to utilize the Super 8® Marks and to promote the Super 8® brand name.

14.     SWI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Super 8® Marks as distinctly designating SWI guest lodging services as originating with SWI.

15.     The value of the goodwill developed in the Super 8® Marks does not admit of precise monetary calculation, but because SWI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of SWI's goodwill exceeds hundreds of millions of dollars.

16.     The Super 8® Marks are indisputably among the most famous in the United States.

<u>The Agreements Between The Parties</u>

17.     On or about August 14, 2007, SWI entered into the Franchise Agreement with J. Patel and H. Patel[1] for the operation of a 41-room guest lodging facility located at 918 East Lacey Boulevard, Hanford, California 93230, Site No. 19439-69821-01 (the "Facility").  A true copy of the Franchise Agreement is attached hereto as Exhibit A.

18.     Pursuant to section 5 of the Franchise Agreement, J. Patel and H. Patel were obligated to operate a Super 8® guest lodging facility for a 20-year term, during which time J. Patel and H. Patel were permitted to use the Super 8® Marks in association with the operation and use of the Facility as part of SWI's franchise system.

19.     Pursuant to section 3 of the Franchise Agreement, J. Patel and H. Patel were required, among other things, to make renovations to the Facility, in order to bring the Facility into compliance with "System Standards," "Approved Plans," and/or a "Punch List," all of which were defined in or attached to the Franchise Agreement, and to achieve and maintain certain scores on periodic quality assurance inspections conducted by SWI.

20.     Pursuant to section 3.4 of the Franchise Agreement, J. Patel and H. Patel were required to operate the Facility in compliance with SWI's "System Standards," as defined in the Franchise Agreement, including SWI's quality assurance requirements.

21.     Pursuant to section 4.8 of the Franchise Agreement, SWI had "the unlimited right to conduct unannounced quality assurance inspections" of the Facility (and

---

[1] By letter amendment dated April 27, 2007, a true copy which is attached hereto as <u>Exhibit B</u>, the names listed on the Franchise Agreement were amended to "Jagdish P. Patel" and "Hansa C. Patel".

unlimited reinspections if the Facility received a failing score in the inspection) to determine whether the Facility was in compliance with SWI's quality assurance requirements.

22.     Pursuant to section 7 and Schedule C of the Franchise Agreement, J. Patel and H. Patel were required to make certain periodic payments to SWI for royalties, system assessment fees, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

23.     Pursuant to section 7.3 of the Franchise Agreement, J. Patel and H. Patel agreed that interest is payable "on any past due amount payable to [SWI] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

24.     Pursuant to section 3.8 of the Franchise Agreement, J. Patel and H. Patel were required to disclose, among other things, the amount of gross room revenue earned by J. Patel and H. Patel at the Facility for purposes of establishing the amount of royalties and other Recurring Fees due to SWI.

25.     Pursuant to section 3.8 of the Franchise Agreement, J. Patel and H. Patel agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the Franchise Agreement, J. Patel and H. Patel agreed to allow SWI to examine, audit, and make copies of the entries in these books, records, and accounts.

26.     Pursuant to section 11.2 of the Franchise Agreement, SWI could terminate the Franchise Agreement, with notice to J. Patel and H. Patel, for various reasons, including J. Patel and H. Patel's (a) failure to pay any amount due SWI under the Franchise Agreement, (b) failure to remedy any other default of their obligations or warranties under the Franchise Agreement within 30 days after receipt of written notice from SWI specifying one or more

defaults under the Franchise Agreement, and/or (c) receipt of two or more notices of default under the Franchise Agreement in any one year period, whether or not the defaults were cured.

27.     Pursuant to section 12.1 and section 18.1 of the Franchise Agreement, J. Patel and H. Patel agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, they w ould pay liquidated damages to SWI in accordance with a formula specified in the Franchise Agreement.

28.     Section 18.1 of the Franchise Agreement specifically set liquidated damages for the Facility at $1,000.00 for each guest room J. Patel and H. Patel were authorized to operate at the time of termination.

29.     Section 13 of the Franchise Agreement specified J. Patel and H. Patel's obligations in the event of a termination of the Franchise Agreement, including their obligation to immediately cease using all of the Super 8® Marks.

30.     Pursuant to section 17.4 of the Franchise Agreement, J. Patel and H. Patel agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

31.      Pursuant to section 13.2 of the Franchise Agreement, J. Patel and H. Patel agreed that, when the Franchise Agreement is terminated, SWI has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [J. Patel and H. Patel] [have] not removed or obliterated within five days after termination."

<u>The Defendants' Defaults and Termination</u>

32.     J. Patel and H. Patel repeatedly breached their obligations under the Franchise Agreement by failing to operate the Facility in accordance with SWI's System Standards as required by the Franchise Agreement, in breach of their obligations under the Franchise Agreement.

33.     On February 26, 2014, SWI conducted a quality assurance ("QA") inspection of the Facility.  By letter dated  March 6, 2014, a true copy of which is attached hereto as <u>Exhibit C</u>, SWI advised J. Patel and H. Patel that (a) the Facility received a failing score in the QA inspection and, as a result, J. Patel and H. Patel were in default of their obligations under the Franchise Agreement, (b) pursuant to the Franchise Agreement, they had 45 days within which to cure the QA default, and (c) if the default was not cured, then the Franchise Agreement might be subject to termination.

34.     By letter dated June 30, 2014, a true copy of which is attached as <u>Exhibit D</u>, SWI terminated the Franchise Agreement, effective June 30, 2014, as a result of J. Patel and H. Patel's failure to satisfy required quality standards, and advised J. Patel and H. Patel that (a) they had to de-identify the Facility within 10 days from delivery of the termination notice, (b) all items bearing the Super 8® Marks had to be removed, (c) they were required to pay to SWI as liquidated damages for premature termination the sum of $41,000.00 as required under the Franchise Agreement, and (d) demand was made for all outstanding Recurring Fees through the date of termination.

35.     The termination of the Franchise Agreement precludes J. Patel and H. Patel from any further use of the Super 8® Marks in or around the Facility.

36.     The termination of the Franchise Agreement precludes J. Patel and H. Patel from any further use of the Super 8® Marks to induce the traveling public to use the Facility in any way.

37.     Since the termination of the Franchise Agreement, J. Patel and H. Patel have continued to use the Super 8® Marks to induce the traveling public to rent guest rooms at the Facility.

38.     Since the termination of the Franchise Agreement, J. Patel and H. Patel have used the Super 8® Marks without authorization to rent rooms through, among other things, failure to remove Super 8® signage and continuing to identify the Facility as a Super 8® guest lodging facility.

39.     J. Patel and H. Patel have continued to misuse the Super 8® Marks despite receiving notification from SWI to cease and desist from the misuse of the Super 8® Marks.

## FIRST COUNT

40.     SWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 39 of the Verified Complaint.

41.     Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

42.     J. Patel and H. Patel marketed, promoted, and rented, and continue to market, promote, and rent rooms at the Facility through the unauthorized use of the Super 8®

Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

43.   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

44.   The acts of J. Patel and H. Patel in marketing, promoting, and renting rooms at the Facility, through and with the Super 8® Marks, constitute:

      a.   a false designation of origin;

      b.   a false and misleading description of fact; and

      c.   a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of J. Patel and H. Patel's Facility with SWI, and to cause confusion, or to cause mistake, or deception, to the effect that SWI sponsors or approves of the guest lodging services that J. Patel and H. Patel provide at the Facility, all in violation of Section 43(a) of the Lanham Act.

45.   Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

46.     J. Patel and H. Patel's use of the Super 8® Marks in connection with goods and services at the Facility, after the Super 8® Marks became famous, caused and will continue to cause dilution and disparagement of the distinctive quality of the Super 8® Marks, and lessened and will continue to lessen the capacity of the Super 8® Marks to identify and distinguish the goods and services of SWI, all in violation of Section 43(c) of the Lanham Act.

47.     J. Patel and H. Patel's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

48.     J. Patel and H. Patel's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on SWI.

49.     SWI has no adequate remedy at law.

50.     No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), SWI demands judgment against J. Patel and H. Patel:

(a) Preliminarily and permanently restraining and enjoining J. Patel and H. Patel, their affiliates, subsidiaries, officers, agents, servants, employees and attorneys, and all those who act in concert or participation with them, from marketing, promoting, or selling guest lodging services at the Facility through and with the Super 8® Marks; and

(b) Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

51.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 50 of the Verified Complaint.

52.     Pursuant to sections 3.8 and 4.8 of the Franchise Agreement, J. Patel and H. Patel agreed to allow SWI to examine, audit, and make copies of J. Patel and H. Patel's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

53.     J. Patel and H. Patel have engaged in acts and practices, as described, which amount to infringement of the Super 8® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

54.     As a result, J. Patel and H. Patel owe restitution and the disgorgement of profits, in an amount unknown to SWI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from J. Patel and H. Patel.

**WHEREFORE**, SWI demands judgment ordering that J. Patel and H. Patel account to SWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Super 8® Marks.

## THIRD COUNT

55.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 54 of the Verified Complaint.

56.     On June 30, 2014, SWI terminated the Franchise Agreement, effective June 30, 2014, due to J. Patel and H. Patel's failure to satisfy the required quality standards.

57.     Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to action of J. Patel and H. Patel, J. Patel and H. Patel shall pay liquidated damages to SWI within 30 days of termination.

58.     Pursuant to section 18.1 of the Franchise Agreement, liquidated damages were set at $1,000.00 for each guest room J. Patel and H. Patel were authorized to operate at the time of termination if termination occurred before the last two years of the Franchise Agreement term.

59.     As a result of the termination of the Franchise Agreement, J. Patel and H. Patel are obligated to pay SWI liquidated damages in the amount of $41,000.00, as calculated pursuant to sections 12.1 and 18.1 of the Franchise Agreement.

60.     Notwithstanding SWI's demand for payment, J. Patel and H. Patel have failed to pay SWI the liquidated damages as required in sections 12.1 and 18.1 of the Franchise Agreement.

61.     SWI has been damaged by J. Patel and H. Patel's failure to pay liquidated damages.

**WHEREFORE**, SWI demands judgment against J. Patel and H. Patel for liquidated damages in the amount of $41,000.00, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

62.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 61 of the Verified Complaint.

63.     By virtue of the premature termination of the Franchise Agreement, SWI sustained a loss of future revenue over the remainder of the 20-year term of the Franchise Agreement.

64.     If the Court determines that J. Patel and H. Patel are not liable to pay SWI liquidated damages as required by sections 12.1 and 18.1 of the Franchise Agreement then, in the alternative, J. Patel and H. Patel are liable to SWI for actual damages for the premature termination of the Franchise Agreement.

65.     SWI has been damaged by J. Patel and H. Patel's breach of their obligation to operate a Super 8® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, SWI demands judgment against J. Patel and H. Patel for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

66.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 65 of the Verified Complaint.

67.     Pursuant to section 7 and Schedule C of the Franchise Agreement, J. Patel and H. Patel were obligated to remit Recurring Fees to SWI.

68.     Despite their obligation to do so, J. Patel and H. Patel failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $17,252.43.

69.     J. Patel and H. Patel's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged SWI.

**WHEREFORE**, SWI demands judgment against J. Patel and H. Patel for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $17,252.43, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

70.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 69 of the Verified Complaint.

71.     At the time of the termination of the Franchise Agreement, J. Patel and H. Patel were obligated to pay SWI Recurring Fees.

72.     Despite their obligation to do so, J. Patel and H. Patel failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $17,252.43.

73.     In addition, J. Patel and H. Patel benefited from their wrongful use of the Super 8® Marks after termination of the Franchise Agreement and paid no royalty or other Recurring Fees to SWI in return for that benefit.

74.     J. Patel and H. Patel's failure to compensate SWI constitutes unjust enrichment and has damaged SWI.

**WHEREFORE**, SWI demands judgment against J. Patel and H. Patel for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $17,252.43, together with interest, attorneys' fees, costs of suit, and all royalties and other Recurring Fees that should be paid to compensate SWI for the period during which J. Patel and H. Patel misused the Super 8® Marks and were thereby unjustly enriched, together with interest and costs of suit.

## SEVENTH COUNT

75.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 74 of the Verified Complaint.

76.     On June 30, 2014, SWI terminated the Franchise Agreement, effective June 30, 2014, due to J. Patel and H. Patel's failure to satisfy the required quality standards.

77.     Section 13.2 of the Franchise Agreement provides that, when the Franchise Agreement is terminated, SWI has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [J. Patel and H. Patel] [have] not removed or obliterated within five days after termination."

78.     J. Patel and H. Patel continue to market, promote, and rent rooms at the Facility through the unauthorized use of the Super 8® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers.

79.     J. Patel and H. Patel's unauthorized use of the Super 8® Marks has inflicted and continues to inflict irreparable harm on SWI.

**WHEREFORE**, SWI demands judgment declaring that SWI, or its authorized agent, has the right, without prior notice to J. Patel and H. Patel, to enter the property at the Facility and remove any and all exterior signage, exterior items and other exterior materials displaying the Super 8® Marks.

**LeClairRyan**
Attorneys for Plaintiff
Super 8 Worldwide, Inc.,
formerly known as Super 8 Motels, Inc.



By: _____
                        **Bryan P. Couch**

Dated: 6 | 28 | 16

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.


**LeClairRyan**
Attorneys for Plaintiff
Super 8 Worldwide, Inc.,
formerly known as Super 8 Motels, Inc.


By: _____
           **Bryan P. Couch**

Dated: 6/28/16

## VERIFICATION

STATE OF NEW JERSEY  )
                                   ) ss:
COUNTY OF MORRIS  )

        Suzanne Fenimore, of full age, being duly sworn according to law, upon his oath, deposes and says:

        I am the Senior Director of Contracts Compliance for Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., which is plaintiff in this action.

        I have read the foregoing Verified Complaint and all the allegations contained therein.  Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of SWI and/or information available through employees of SWI.

                                        _____
                                        SUZANNE FENIMORE

Sworn and subscribed to before
me this 17th day of June, 2016

_____
    NOTARY PUBLIC

        CINDY J. O'CONNOR
          Notary Public
        State of New Jersey
   My Commission Expires Feb. 13, 2020

# EXHIBIT A

Location: Hanford, CA
Entity No. 09821-01
Unit No.: 79439

# SUPER 8 MOTELS, INC.
# FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated August 14 200 7 , is between **SUPER 8 MOTELS, INC.**, a South Dakota corporation ("we", "our" or "us"), and **JAGDISH PATEL & HANSA PATEL**, joint tenants ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

1.  **License.** We have the exclusive right to license and franchise to you the distinctive "Super 8" System for providing economy lodging motel services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The License is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Super 8 Motel" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

2.  **Protected Territory.** We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility of the same name (Super 8 Motel) in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory (other than the Facility) unless we or our affiliate licenses the facility, and/or (ii) any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located with the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.

1

SUPEXC1
216608  03/07

**3.** **Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and the renovations specified on any Punch List attached to this Agreement is ninety (90) days after the Effective Date. All renovations will comply with System Standards, any Approved Plans and the Punch List. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3.3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. You must also pay us the Reinspection Fee described in Section 3.9 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it. We may grant you an extension of time to complete the items on your Punch List in our sole discretion. The grant of an extension to perform your Improvement Obligation will not waive any other default existing at the time the extension is granted.

3.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to you or your lenders, contractors, employees, guests or others on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material modifications to or variations from the Approved Plans require our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3     **Pre-Opening.**  You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual.  If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark.  We may delay the Opening Date until you pay the Royalty accruing under this Section.

3.4     **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards.  You will not operate a Food and Beverage service without our prior written consent, except for a complimentary coffee service/continental breakfast in accordance with System Standards.  If you do not manage the Chain Facility personally, you must employ a full-time general manager who will be dedicated solely to the Facility.  You will keep the Facility in a clean, neat, and sanitary condition.  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards.  The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual and follow standard industry practices for safeguarding cardholder information, including but not limited to, the Payment Card Industry Data Security Standard.  You may add to or discontinue the amenities, services and facilities described in Schedule B, or to lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay.  Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5     **Training.**  If this is your first System franchise, you or one of your principal owners will attend an orientation program as described in Section 4.1.  The Facility's initial and any replacement general manager must complete to our satisfaction the manager training program described in Section 4.1, even if you employ other managers for other Chain Facilities who have already received such training.  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement.  You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, tuition, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6     **Marketing.**

3.6.1   You will participate in System marketing programs, including the Directory and the Reservation System.  You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System.  You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants.  You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards.  You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks

correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3:6.2 The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs. You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7   **Governmental Matters.**   You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.8   **Financial Books & Records; Audits.**

3.8.1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Sales is a material obligation you accept under this Agreement.

3.8.2  Upon our request, you will send us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the

4

confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Sales for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.8 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Sales you reported to us during the fiscal year fairly present the Gross Room Sales of the Facility computed in accordance with this Agreement for the fiscal year.

3.9  **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. You will also be charged the Reinspection Fee if we are required to return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Section 3.1. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10  **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Super 8 Motels, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their current and former affiliates, successors and assigns as additional insureds.

5

SUPEXC1
216608  03/07

3.11     **Conferences.**  Chain conferences are held on either a chain-wide or regional basis.  You or your representative must attend each Chain conference and pay the Conference Fee we set for Chain franchisees, if and when we determine to hold a Chain conference.  If you operate other lodging facilities under the System in addition to the Facility, you must send a different representative to the Chain conference and pay another Conference Fee for each facility.  We will charge you and you must pay the Conference Fee even if you do not attend the Chain conference.  You will receive reasonable notice of a Chain conference.

3.12     **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve.  You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13     **Good Will.**    You will use reasonable efforts to protect, maintain and promote the name "Super 8 Motels" and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System.  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.  You will refer any guest that the Facility cannot accommodate to the nearest Chain Facility unless and until the guest expresses a preference for a different lodging facility.  You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.

3.14     **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each additional guest room you may add to the Facility over 120 rooms.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15     **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual (from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16     **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 90 days after the notice is issued, having an aggregate cost for labour, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.  You will perform the Minor Renovations as and when the Minor Renovation Notice requires.  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility is more than 200 points (or equivalent scores under a

6

successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation

**4.1.1 General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program. The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We may also offer certain Internet-based training as a supplement to the classroom training experience. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction before the Opening Date. Any replacement general manager must complete general manager orientation to our satisfaction no later than 90 days after he/she assumes the position. If we do not offer a place in general manager orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition for general manager orientation which is payable before the scheduled date of the program. The tuition for your first general manager is $1,250 if he/she attends orientation within the time period required under this section. For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits. We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class. If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period. We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation. This is in addition to the tuition you must pay us for your general manager at the then in effect rate when he/she attends orientation. See Section 4.1.5.

**4.1.2 Owner Orientation Training.** We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services. If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation before the Opening Date. If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 which is payable before the scheduled date for the program. You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 90 day period. We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation. See Section 4.1.5.

7

4.1.3 **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. This training may be offered at our corporate offices, at a regional location, on-line or at the Facility. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. Tuition for remedial training must be paid before the training commences. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

4.1.4 **Re-Certification; Supplemental Training.** General managers who have completed S.T.E.P. or Advanced S.T.E.P. must be re-certified every two years by taking a refresher S.T.E.P. class or other training we may designate for this purpose. You must pay us the then current tuition for this training and your general manager's travel expense, compensation and benefits for attending the program. The training may be held at our corporate offices, at Chain conferences or at other locations. We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or other locations or held in conjunction with a Chain lodging conference. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5 **No-Show and Cancellation Fees.** If you or your general manager fails to attend orientation within the required time period, or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a No-Show Fee of up to 100% of the tuition for the program. If you or any other member of your staff cancels participation in any training program less than 15 days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2     **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use System Assessment Fees as specified in Schedule C, allocated in our discretion from the Advertising and Reservation Fund, for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We may use funds in the Advertising and Reservation Fund to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System.

8

### 4.3   Marketing

4.3.1   We will use System Assessment Fees, allocated in our discretion from the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of System publications and directories of hotels.   We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs.   System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities.   We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities.

4.3.2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3   We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for separate fees in addition to the System Assessment Fee, for any resulting group booking accepted at the Facility.

4.3.4   We will publish the Chain Directory.   We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements.   We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication.   We may assess a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4   **Purchasing and Other Services.**   We may offer optional assistance to you with purchasing items used at or in the Facility.   Our affiliates may offer this service on our behalf.   We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts.   We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards. We may offer optional architectural and design services for the Facility for a separate fee.

4.5   **The System.**   We will control and establish requirements for all aspects of the System.   We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions.   We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6   **Consultations and Standards Compliance.**   We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we

9

conduct. We will provide telephone and mail consultation on matters of Facility operation and marketing through our representatives. We will offer y u access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7    **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time.

4.8    **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $1,000 00 when we invoice you for an Audit Fee *under Section 3.8.* We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

5.    **Term.** The Term begins on the Effective Date and expires at the end of the twentieth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6.    **Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000. You will pay us a non-refundable Initial Fee in the amount of **$24,000,** when you sign this Agreement, which is fully earned when we sign this Agreement.

7.    **Recurring Fees, Taxes and Interest.**

7.1    You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). The Royalty and System Assessment Fees described in this Section 7.1 are payable 15 days after the month in which they accrue, without billing or demand. Other Recurring Fees are payable at the time set forth in the System Standards. Recurring Fees include the following:

7.1.1    A "Royalty" equal to five and one half percent (5.5%) of Gross Room Sales of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2    A "System Assessment Fee" as stated in Schedule C to be paid into the Advertising and Reservation Fund, accrues from the Opening Date until the end of the Term, including during suspension periods. Upon 60 days written notice, we may change the System Assessment Fee after

the tenth anniversary of the Effective Date to cover costs as described in Schedule C. You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as travel and other sales agent commissions paid for certain reservations at the Facility plus a reasonable service charge, a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet, or other reservation systems and networks, and fees for additional services and programs. We may increase or adjust the Additional Fees to cover the cost of the services or to add new services or programs at any time on not less than 60 days prior written notice.

7.2   "Taxes" are equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State. You will pay Taxes directly to us when due.

7.3   "Interest" is payable on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid. Interest is payable when you receive our invoice.

7.4   If a Transfer occurs, your transferee or you will pay us a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

## 8.   Indemnifications.

8.1   Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2   You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any effect on parties other than you and the complaining party in the matter, or could serve as a precedent for other matters.

11

8.3    We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.  Your Assignments, Transfers and Conveyances.

9.1  **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2  **Public Offerings and Registered Securities.**  You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3  **Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection. We will provide a Punch List of improvements we will require after

12

we receive the transferee's Application. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in, the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4  **Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5  **Attempted Transfers.**  Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6  **Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

10.  **Our Assignments.**  We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

11.  **Default and Termination.**

SUPEXC1
216608 03/07

11.1   **Default.**   In addition to the matters identified in Sections 3.1 and 3.8 you will be in default under this Agreement if (a) you do not pay us wh n a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement.   If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2.   We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed.   In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, you must act diligently to cure the default and resolve health, safety, cleanliness and housekeeping failures identified in the inspection report within 30 days after the failing inspection.   Within 90 days after the failing inspection, you must also cure the remaining items identified in the inspection report and renovate and improve the Facility to meet our then current System Standards for entering conversion properties (or other standards specified under System Standards if we are not then accepting conversions) to cure the default.   At your request, we will determine and provide a written improvement plan to assist your efforts to cure the default.

11.2   **Termination.**   We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Super 8 Motel", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you or any of your Equity Interest owners contest in court the ownership or right to license or franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3   **Casualty and Condemnation.**

11.3.1   You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available.   You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations.   You will tell us in writing within 60 days after the Casualty whether or not you will

14

restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate the License, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If the License so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty.

11.3.2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3  The exclusive territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4   **Our Other Remedies.**  If you violate your covenant in Section 2; we may reduce the Protected Territory to the Location. We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Reservation System User Fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. If needed, our consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5   **Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

12.   **Liquidated Damages.**

15

12.1 Generally. If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination. If Termination occurs during the last two License Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.1, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment. Before the last two License Years, Liquidated Damages will be **as set forth in Section 18.1.** If we terminate this Agreement before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable after the Opening Date. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2   **Condemnation Payments.** If a Condemnation occurs, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2 or until the Condemnation occurs, whichever is longer. If the Condemnation is completed before the one year notice period expires, you will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

12.3   **Exclusions.** The amount of System Assessment Fees used in the computation of Liquidated Damages shall exclude travel agent commissions, airline reservation system charges and related handling charges.

**13.**   **Your Duties At and After Termination.** When this Agreement terminates for any reason whatsoever:

13.1   **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2   **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Sales accruing while the Facility is identified as a "Super 8 Motel", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third

16

SUPEXC1
216608  03/07

parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3     **Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4     **Survival of Certain Provisions.**  Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.** · **Your Representations and Warranties.**  The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement. You expressly represent and warrant to us as follows:

14.1     **Quiet Enjoyment and Financing.**   You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2     **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except

17

as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15.   Proprietary Rights.

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

18

15.4    **Confidential Information.**    You will take all appropriate actions to preserve the confidentiality of all Confidential Information.    Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.    You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).    You will use Confidential Information only for the Facility and to perform under this Agreement.    Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.    Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.    We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5    **Litigation.**    You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.    We alone handle disputes with third parties concerning use of all or any part of the System.    You will cooperate with our efforts to resolve these disputes.    We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6    **The Internet.**    You may use the Internet to market the Facility subject to this Agreement and System Standards.    You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent.    You will assign to us any such identification at our request without compensation or consideration.    You will make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties.    You must participate in the Chain's best available rate on the Internet guarantee or successor program.    The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary.    You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards.    Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16.    **Relationship of Parties.**

16.1    **Independence.**    You are an independent contractor.    You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever.    We and you have a business relationship based entirely on and circumscribed by this Agreement.    No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this

19

Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2  **Joint Status.**  If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1  **Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2  **Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3  **Notices.**  Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Super 8 Motels, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No. 1-800-643-2107

Your name: **Jagdish Patel & Hansa Patel**
Your address: **918 E. Lacy Boulevard, Hanford, CA 93230**
Attention: **Jagdish Patel**
Your fax No.: **559-583-1888**

20

SUPEXC1
216608  03/07

**17.4 Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all cos..s and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

**17.5 Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

**17.6 Choice of Law; Venue; Dispute Resolution.**

**17.6.1** This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

**17.6.2** The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

**17.6.3** You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4 WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.7 Special Acknowledgments.** You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.

**17.7.1** You received our UFOC for prospective franchisees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

**17.7.2** Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based

21

SUPEXC1
216608 03/07

on any oral or written representation or promise not stated in this Agreement.

17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

18.   **Special Stipulations.**   The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1   **Liquidated Damages.**  Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be One Thousand Dollars ($1,000.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

18.2   **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the fifth, tenth or fifteenth  anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 200 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score less than 200 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You

REMAINING PORTION OF THE PAGE INTENTIONALLY LEFT BLANK

will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

**18.3  Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the fifth, tenth or fifteenth anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

**18.4  Transfer Rights.** If you are then not in default under this Agreement, at any time before the end of the first License Year, you may assign this Agreement at the same time as you convey the Facility to an entity in which you or the persons listed on Schedule B as the original owners of your Equity Interests are to be owners of at least 51% of the Equity Interests of the entity and retain control over the entity so that change of control, as defined in an Equity Transfer (Appendix A) does not occur. The transferee and you must sign and deliver to us the Assignment and Assumption Agreement in the form attached as an exhibit to this Agreement before you transfer the Facility. No Application or Relicense Fees will be charged. The accounts of the transferee and you must be current at the time of transfer, or we will not recognize the transfer. The transferee must submit (i) an application on our standard form, (ii) its organizational agreement or charter, (iii) updated insurance, and (iv) an updated Guaranty with the Assignment and Assumption Agreement. We will not recognize the transfer as effective until these documents are completed and delivered to us. The transferee must send us a copy of the warranty deed conveying the Facility within 30 days after its delivery.

**18.5  Reduced Relicense Fee.** If (i) you are not then in default under this Agreement, (ii) we receive your proposed transferee's Franchise Application and Application Fee before you Transfer the Facility, and (iii) we receive the Franchise Application before the end of the third License Year, then the Relicense Fee for a Transfer will be $5,000. If the conditions are not satisfied, and after the third License Year, the Relicense Fee will be as specified in Section 7.4.

**18.6  Signage Credit.** We will pay you a signage credit, to help you defray the cost of your System signage, if you meet the conditions set forth in this Section 18.1. The credit will be issued in the amount of $100.00 multiplied by the number of open guest rooms at the Facility when it opens, up to a maximum credit of $10,000.00 but not more than 50% of your equity investment in the Facility. The conditions are: (a) The Facility must open meeting System Standards with at least 50 guest rooms open and rentable to guests; (b) You must complete all pre-opening improvements required under the Punch List (if the Facility is a conversion) before the Opening Date; (c) You must meet the opening deadline specified in Section 3.1; (d) You must obtain your signage for the Facility bearing any Marks from one of our approved suppliers; and (e) You must sign this Agreement and pay the full amount of your Initial Fee no later than December 31, 2007. You will receive a credit against your Royalties accruing under Section 7 in the amount of the signage credit. We may apply the credit to any amounts you otherwise may owe us or WWC Supplier Services, Inc. The signage credit will be unavailable if you do not timely satisfy these conditions.

SUPEXCI
204168 Q3 AUGUST 2006

IN WITNESS WHEREOF, the parties have executed this Agreement on this 14 day of
aug_____, 2007 and agree to be bound by the terms and conditions of this Agreement as of the
Effective Date.

**WE:**
**SUPER 8 MOTELS, INC.**

By: _____          Attest: _____
     Vice President                                Assistant Secretary


**YOU, as Franchisee:**
**JAGDISH PATEL & HANSA PATEL**

By: _____          Witness: _____
     **Jagdish Patel**
     **Individually**


By: _____          Witness: _____
     **Hansa Patel**
     **Individually**

24

SUPEXC1
216608  03/07

# APPENDIX A

## DEFINITIONS

Advertising and Reservation Fund or "the Fund" means The Super 8 Advertising and Reservation Fund into which System Assessment Fees are paid. The Fund is under our exclusive control, and shall be used by us for funding and administering, in our sole discretion, the reservation system, the training school, national and international directories, print and broadcast media advertising, technical and professional advice, consultation and services in connection with advertising, employment of personnel and office expenses for the administration of the Fund, advertising agency commissions, and other advertising or promotional programs we establish to promote the Chain.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities.

25

including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Super 8 Motels and Super Suites facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

26

SUPEXC1
216608 03/07

Gross Room Sales means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) *If the Opening Date occurs on the first day of a month:* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **918 E. Lacy Blvd, Hanford, CA 93230**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

<u>Marks</u> means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Super 8 Motel" and other marks (U.S. Reg. Nos.: 992,721; 1,691,852; 1,686,653; 1,706,143; 1,602,723; 1,343,591, and 1,768,824) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

<u>Marks Standards</u> means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

<u>Minor Renovation</u> means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

<u>Minor Renovation Ceiling Amount</u> means $3,000.00 per guest room.

<u>Minor Renovation Notice</u> means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

<u>Opening Date</u> means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

<u>Operations Standards</u> means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

<u>Permitted Transferee</u> means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

<u>Protected Territory</u> means **all the area within a circle created by a five (5) mile radius whose centerpoint is 918 E. Lacy Blvd, Hanford, CA 93230 (Latitude 36.32807 N and Longitude 119.63289 W).**

<u>Punch List</u> means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

<u>Recurring Fees</u> means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

28

Reinspection Fee means the fee you must pay to us under Section 3.9 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fee means the aggregate of all fees charged under Section 7.1.2 to pay for the cost of the System's marketing, advertising, Reservation System, training and other services.

System Standards means the standards for participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Rules of Operations Manual, the Trademark Identification Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

SUPEXC1
216608 03/07

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Super 8 Motels, Inc., a South Dakota corporation, its successors and assigns.

30

SUPEXC1
216608 03/07

# SCHEDULE A

(Legal Description of Facility)

SUPEXC1
216608 03/07

Escrow No.: 05-41000523-MG
Loan No.: CACH7771-7771-1712-501000723
Title No.: 05-41000523-CK

# EXHIBIT "A"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF KINGS, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

That certain real property in the County of Kings, California, described as follows:

All that portion of the Fractional Southwest quarter of Section 30, Township 18 South, Range 22 East, Mount Diablo Base and Meridian, more particularly described as follows:

Beginning at a point on the North line of the State Highway 198, said point being 1133 feet West and 30 feet North of the Southeast corner of the Southwest quarter of said Section; thence West along said North line of said highway, a distance of 415 feet to the true point of beginning; thence North and parallel with the East line of said parcel hereinabove described, a distance of 245 feet to a point; thence West and parallel with the South line of said Southwest quarter of said Section, Township and Range, to the West line of the parcel of land conveyed to Roland Ted Gamby and wife, and R.L. Hollis and wife, in Deed dated September 22, 1959 recorded November 6, 1959 in Book 747, Page 492 of Official Records, Kings County; thence South 8° 15' East, a distance of 242 feet, more or less, to the North line of said Highway 198; thence East along said highway, a distance of 250 feet to the true point of beginning; And also described as: all that portion of Section 30, Township 18 South, Range 22 East, Mount Diablo Base and Meridian, described as follows:

Beginning at a point on the South line of said Section 1377.0 feet West of the South quarter corner of said Section; thence North 60.0 feet to the true point of beginning; thence West, parallel with the said South line 150.0 feet; thence North 8° 15' West, 247.75 feet; thence East 156.00 feet; thence South 8° 14' West, 245.0 feet to the true point of beginning.

## **SCHEDULE B**

**PART I:        YOUR OWNERS:**

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|---------------------|------------------------|---------------------|
| **Jagdish Patel** | **50%** | **Individually** | |
| **Hansa Patel** | **50%** | **Individually** | |

**PART II:        THE FACILITY:**

Primary designation of Facility: Super 8 Motel

Number of approved guest rooms: 41.

Parking facilities (number of spaces, description): 41+.

Other amenities and facilities:

**PART III:        DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE COMPLETED AS THE IMPROVEMENT OBLIGATION:**

**[Punch List to be attached.]**

_H.P._
Initial

SUPEXC1
216608  03/07



FRANCHISOR:  SUPER 8 MOTELS, INC.

"SCHEDULE B PART III"
PUNCHLIST FOR CONVERSION
DECEMBER 18, 2006

---

**FACILITY**
Hanford Motel Lodge
918 E. Lacy Boulevard
Hanford, CA 93230

**TIER**
Motel

**GUESTROOMS**
41

**OWNER/APPLICANT**
Jack Patel
(559) 582-1006

**SALESPERSON**
Art Sabo
(503) 702-2960

**CONVERSION CONSULTANT**
Andrew A. Bremner

### PROPERTY CONDITION SUMMARY

This 20-plus-year-old property consists of one L-shaped, single and two story, single-loaded, exterior corridor building. Construction is concrete block/brick with a stucco/brick façade and pitched roof. The property will require exterior, public area and guestroom/bath renovations to comply with System Standards. Landscaping upgrades are required to enhance the property curb appeal.

The existing lobby square footage (425 SF) does not meet System Standards and is subject to Brand approval. All rooms are under sized and subject to Brand approval. Currently there are six rooms under renovation. All F. F. & E must meet System Standards prior to opeinig.

The property is located two miles from downtown Hanford and approximately 34 miles South of Fresno Air Terminal airport. The market is mixed between commercial and leisure business. Area competition includes Best Western, Comfort Inn and Holiday Lodge.

|                       | EXISTING      | STANDARD |
|-----------------------|---------------|----------|
| Lobby Dimensions:     | 425 SF        | 500 SF   |
| Guestroom Dimensions: | 273 SF (41)   | 288 SF   |

2
Hanford Motel Lodge
Hanford, CA

## *COMPLETION TIME*
All items listed in this punchlist must be completed before opening as a Super 8 Motel.

## *ATTACHMENT*
SuperStart® specifications

3
Hanford Motel Lodge
Hanford, CA

---

*All Super 8 Motels are required to be in compliance with all items outlined in the Rules of Operation and Design Manual. Following is a partial, but by no means complete, listing.*

---

- Property manager is required to be TripRewards certified and property must fully comply with all TripRewards requirements no later than 90 days after opening.
- All new General Managers are required to complete management training. It is strongly recommended that this take place prior to opening as a Super 8 Motel, but in no event may it be postponed any longer than 90 days after the opening date.
- All first time Super 8 Motel franchisees are required to attend an orientation program.
- Super 8 Motel exterior signage per System Standards.
- Dumpster enclosure to conceal from guests' view is required.
- Landscape upgrades that are professionally designed and executed and approved in advance by the franchisor.
- Each Super 8 Motel is required to provide at a minimum, a complimentary continental breakfast per System Standards.
- A portable phone at the front desk for manager's use.
- Facilities to assist the handicapped in accordance with Local, State and Federal codes, regulations and ordinances.
- Stairwell(s) and corridor(s) must be equipped with emergency and exit lighting with a backup power source.
- Super 8 Motels, Inc. does not allow restaurant or lounge facilities. Restaurant/lounge space must be renovated for alternative use.
- A Company approved Property Management System (PMS) is required.
- Electronic locks meeting System Standards are to be installed all guestroom entrance doors.
- Hardwired smoke detectors with a backup system are required. This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage.
- A safety guard lock (loop bar or chain) or other non-keyed locking device is required.
- Install a self-closing device on all interior guestroom entrance doors.
- A one-way viewer in all guestroom entrance doors.
- A one way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock on all connecting room doors. Operating knobs must be located on room side only with flush plates on inside of doors.
- Replace existing public area signage package to include guestroom door plaques. Super 8 Motels, Inc., requires a professionally printed signage package that complies with current System Standards. Contact Barb Michlitsch at (605) 229-8060 for assistance.
- A minimum of one 20" x 16" framed, glass front picture per bed is required. King bedded rooms may have one 22" x 28" picture.
- AM/FM clock radio in each guestroom.

4
Hanford Motel Lodge
Hanford, CA

---

*All Super 8 Motels are required to be in compliance with all items outlined in the Rules of Operation and Design Manual. Following is a partial, but by no means complete, listing. Continued.*

---

- Provide minimum 24" commercial style, color and remote operable television units.
- Cable or satellite TV including free premium channels.
- A solid wood or upholstered (vinyl not acceptable) luggage bench or wood or metal folding luggage rack is required.
- A GFCI (Ground Fault Circuit Interrupter) outlet in vanity areas is required.
- A1200 watt hairdryer is required in each guest room (wall-mounted in vanity area is recommended).
- A minimum of 60% of guestrooms must be prepared and designated as non-smoking rooms.
- Company requires that all properties maintain housekeeping at the highest levels.
- Logo supplies must be available at the entry inspection but may not be placed in the guestrooms until official opening.
- Provide complimentary high-speed Internet access in all guestrooms per System Standards.

---

*In addition, the following renovations are required for this site.*

---

## PROPERTY SIGNAGE

1.   Provide Super 8 Motel exterior signage per System Standards. Signage must be purchased from a vendor approved in advance by the Franchisor, and may not be installed without prior written approval from the Property Openings Department. **Your License Agreement controls your use of signage and timing of installation.** All existing signage (building, high-rise, channel letters, billboards, etc.) must be removed. Modification of the existing signage or face replacement is prohibited.

2.   Eliminate plywood building signage and refinish affected areas to a like-new condition.

5
Hanford Motel Lodge
Hanford, CA

## PROPERTY EXTERIOR

1.  **Design Services must approve all exterior renovation plans prior to commencement of work. Written approval must be obtained from Design Services for all exterior renovation plans prior to the commencement of work. These plans must be provided by the architect or general contractor. The Company reserves the right to require additional renovations prior to opening if written approval of renovation plans was not obtained, or the actual renovations vary materially from the approved plans. For assistance with design concepts, contact Design Services at (800) 225-5411 (option #3). Renovate to include:**
    a.   Pressure wash/chemically clean stucco and brick façade to eliminate stains and discoloration.
    b.   Incorporate Company design features into the existing guestroom section roofline.
    c.   Repair and recoat stucco soffits where cracked and damaged per manufacturer's specifications.
    d.   Reconstruct porte cochere and incorporate Company design features.
    e.   Paint building exteriors (doors, railings, fascia and trim work). Approved color schemes are required.
    f.   Replace guestroom entrance doors. New doors must be solid-core wood or metal-encased doors. One consistent style/design of doors is required.
    g.   Replace windows where broken (i.e. in lobby area).
    h.   Repaint/refinish walkways. Repour/refinish steps where damaged, chipped and or peeling paint is present.
    i.   Provide walkway light covers where missing. New light covers must match existing light covers or total replacement is required.

2.  Hotpatch, reseal and stripe parking lot to include are under the porte cochere. Resurface badly cracked and damaged areas.

3.  Upgrade landscaping to include the following:
    a.   Reseed/re-sod grass areas where damaged.
    b.   Provide planters at the lobby entrance to include shrubs and a large assortment of colorful, seasonal flowers.

4.  Upgrade pool area to include the following:
    a.   Pool was closed at time of inspection. At time of season opening, pool area and furniture package must meet System Standards. Safety and security package (i.e. shepherd's crook, life preserver, etc.) are required to be displayed year round.
    b.   Install "FT" and Depth markings on both horizontal and vertical coping of the swimming pool.
    c.   Provide an emergency telephone.

6
Hanford Motel Lodge
Hanford, CA

## PROPERTY EXTERIOR CONTINUED

    d.   Refinish pool deck. A non-slip finish is required.

    e.   Replace pool fence new pool fence must be a minimum height of 5'. Gates are to be self-closing and latching. Strongly recommend the installation of an aluminum or metal vertical fencing to match area and building design.

5.    Provide a Dumpster enclosure to conceal from guests' view.

## PUBLIC AREAS

1.    Upgrade Front Desk/Lobby area to include the following:

    a.   Professionally retexture and paint lobby ceiling.

    b.   Remove existing wall paneling and install drywall. Replace wallcovering throughout. Company requires either 12 ounce vinyl wallcovering or an approved textured finish. Conceal exposed wiring at this time

    c.   Replace existing lobby flooring. Company requires cut pile or level loop carpet with padding. Ceramic tile or similar is an acceptable option.

    d.   Replace existing lobby seating package to include tables. Removal of lobby seating package to accommodate breakfast seating is an acceptable option.

    e.   Provide new lobby light package. Accent lighting and dimmer control are recommended to improve the lobby ambiance. Exposed light(s) are not acceptable.

    f.   Provide a new art package. New package must be professionally displayed.

    g.   Upgrade the breakfast area to accommodate all the Super Start specifications. Renovations are required to include but not limited to:

        1.   Provide breakfast area furniture. Company requires seating for 10. Chairs with padded backs and seats are required, unless café style seating (padded seats only) is utilized. Vinyl finishes are recommended, however commercial grade fabric is strongly recommended.

        2.   Provide a built-in breakfast counter/cabinets per specifications in attachment. Banquet style serving table is not acceptable.

        3.   The breakfast room/hospitality area must include a minimum of one 24" commercial style, color and remote operable television enclosed in built-in millwork that will match or complement the new decor.

7
Hanford Motel Lodge
Hanford, CA

## PUBLIC AREAS CONTINUED

    h.    Replace registration desk.  Recommend a light, neutral color high-pressure laminate, cultured marble or similar upgraded finish.

    i.    Remove handwritten front desk signage and provide professionally produced/displayed signage. Handwritten signage is not acceptable.

    j.    Provide new window dressing. Draperies with sheers blinds with a fabric upholstered cornices, valance, etc.

2.    Replace existing public area signage package to include guestroom door plaques. Super 8 Motels, Inc., requires a professionally printed signage package that complies with current System Standards. Contact Barb Michlitsch at (605) 229-8060 for assistance.

3.    Property manager is required to be TripRewards certified and property must fully comply with all TripRewards requirements no later than 90 days after opening.

4.    Provide flammable storage per System Standards.

## COMPLIMENTARY CONTINENTAL BREAKFAST

All Super 8 motels are required to provide SuperStart® breakfast service. The breakfast must be presented using quality foods, utensils and display equipment in a tasteful and sanitary manner as specified throughout this section. State and local health codes as well as ease of accessibility (ADA) must prevail at all times. All breakfast items must be provided with no charge to the guest.

### Requirements

1.    The breakfast must be complimentary for each registered Super 8 Motel guest.

2.    The breakfast must be available for a minimum of 3 consecutive hours between the hours of 6 a.m. and 10 a.m., seven days a week, 365 days per year.

3.    Serving hours should be increased to meet occupancy demands.

4.    Serving hours must be posted in the breakfast area.

5.    The individual Super 8 Motel operator must ensure compliance with local health and sanitation requirements.

8
Hanford Motel Lodge
Hanford, CA

## COMPLIMENTARY CONTINENTAL BREAKFAST CONTINUED

6. Breakfast quantities must be sufficient based on the previous night's occupancy. Sufficient staff must be available to ensure proper replenishment and guest satisfaction.

7. Breakfast must be presented in an attractive, clean, professional, appetizing and neat manner.

8. An area should be set-aside in the lobby, properly furnished, for the breakfast offering. An adjacent hospitality/breakfast area is recommended.

9. Any deviation from the breakfast standard must be approved in writing by the Company.

## PROPERTY MANAGEMENT SYSTEM REQUIREMENTS

1. A Company approved Property Management System (PMS) is required. Requirements are below, or as specified in your License Agreement.
   a. Dot matrix printers will require a paper hole for the bottom feed of forms.
   b. A space for the file server must be made in the front desk area or in an area which is accessible 24-hours a day including the ability for the night auditor to utilize it.
   c. Space must be located near the file server for any interface equipment that will be needed, i.e.: call accounting and Point of Sale (POS) terminals. When considering the placement of this equipment remember that it will need electrical outlets and that the interface vendor will need to run cable from the interface equipment to the Property Management System (PMS).

2. Hardware power requirements are as follows:
   a. Proper electrical connections must be in place or the Property Management System will not be installed. Refer to the Installation Guide for specifications.
   b. One Uninterrupted Power Supply (UPS) unit will be supplied with the package. The UPS must be placed at least three feet from the file server.
   c. The file server and its monitor will plug into the UPS using 2 of its power outlets.
   d. Each workstation will require 2 power outlets.
   e. Each printer and modem will require 1 power outlet each.
   f. The UPS will require 1 Dedicated power outlet on its own dedicated circuit breaker.

3. Telephone line requirements are as follows:

9
Hanford Motel Lodge
Hanford, CA

## PROPERTY MANAGEMENT SYSTEM REQUIREMENTS CONTINUED

    a.   Two dedicated telephone lines with their own phone numbers are required. Three are recommended.  No other modems, fax machines, etc are to be connected to these phone lines. For the third phone line, used for Internet access, we will allow a line to run through your phone switch.

    b.   Two modems will be supplied with the package.

4.    Interface vendors must be contacted in advance to insure that they will meet the requirements.  The franchisee is responsible for arranging any required interface upgrades that may be necessary and for the testing of these upgrades.

5.    All cable must be from a Company approved vendor. Refer to the Installation Guide for specifications.

## GUESTROOMS/BATHS (Rooms Inspected #104, #107, #117, #220, #219 and #210):

1.    Currently there are six rooms under renovation. Prior to opening, all F. F. & E must meet System Standards.

2.    Provide complimentary high-speed Internet access (hardwired or wireless) in all guestrooms located near the writing surface per System Standards.

3.    Upgrade guestroom entrance doors to include the following:
    a.   Install electronic locks per System Standards.
    b.   Install secondary locks (chain or u-bar).
    c.   Install a one-way viewer in all guestroom entrance doors.

4.    Install a backup system in addition to the existing hardwired smoke detectors.  This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage.

5.    Renovate guestrooms to include the following:
    a.   All furniture finishes and fixtures must coordinate with other room furnishings.
    b.   An AM/FM clock radio is required in each guestroom.
    c.   Cable or Satellite TV with free premium channels is required. Channel selections include the major networks (ABC, NBC, CBS or FOX, etc. and premium selection free movies (HBO®, Showtime®, etc.) news (CNN or FOX, etc.) and sports channels (ESPN or FOX, etc.).
    d.   Replace carpet.  Company requires minimum 30- ounce cut pile or precision cut carpet with padding. Carpet must also be wall to wall.
    e.   Replace inoperable and/or damaged PTAC units as in rooms #107 and #117.

10
Hanford Motel Lodge
Hanford, CA

## *GUESTROOMS/BATHS CONTINUED*

    f.    Replace furniture package to include leisure chairs. New casegoods are to include a minimum of one credenza/armoire', a framed wall mirror, one headboard per bed, one freestanding nightstand in rooms with two beds and rooms with one bed smaller than a king, and two freestanding nightstands in rooms with a king bed. A minimum of one writing surface is required to consist of either a writing desk or an activity table. Two chairs (minimum one with arms) per room are required. Chairs must be fabric covered.

    g.    Replace artwork.  A minimum of one 20" x 16" framed, glass front picture per bed is required. King bedded rooms may have one 22" x 28" picture

    h.    Replace bedspreads. Ensure new bedspreads match or complement existing draperies. Each bed must have a quilted bedspread of an appropriate size for the bed.

    i.    Replace/provide lamp package.  Provide one lamp per headboard and lighting in the work area, leisure area and credenza area.  All wall-mounted lamps must have wire covers or molding, loose cords are not acceptable.  Lamp package must be neutral and contemporary (i.e. brass). The use of red or other colors of anodized metal is not recommended.  Swag lamps are not acceptable.

    j.    Replace existing 20" televisions and provide minimum 24" commercial style, color and remote operable television units.

6.    Installation of the following items per new System Standards is required:
- In-room coffee makers
- Multi-function shower heads
- Curved shower rods
- Super 8 Motel approved Hookless® shower curtains.

7.    No mattress may be older than 7 years and must be replaced no later than December 31, 2008 with Super 8 Motel upgraded bedding specifications.

8.    Renovate bath areas to include:

    a.    A GFCI (Ground Fault Circuit Interrupter) outlet in vanity areas is required.

    b.    A 1200-watt hairdryer is required in each guest room (wall-mounted in vanity area recommended).

    c.    Replace bathroom doors where worn, scuffed and/or holes are present as in rooms #104, #107 and #219.

    d.    Provide towel rack and/or bar/shelf units.

    e.    Repair/retexture and paint walls/ceilings where damaged and/or patched as in rooms #104, #220 and #210. New paint must match existing paint color or total repainting is required.

11
Hanford Motel Lodge
Hanford, CA

## GUESTROOMS/BATHS CONTINUED

    f.    Replace bathtubs where stained and/or damaged as in room #219. The installation of commercial grade liners or professionally restoring surfaces to like new condition is an acceptable option.

    g.    Replace tub plumbing fixtures/trim where tarnished or corroded (faucets, drain rings, etc.) as in room #219.

    h.    Replace toilet seat/lid units where worn and/or scuffed as in rooms #219 and #210.

    i.    Replace vanity mirrors where damaged and/or de-silvering as in rooms #104, #117 and #210. At a minimum 30" x 30" mirrors are required.

## RECOMMENDATIONS

1.    Set up a display in the lobby to show the architectural renderings and interior design color boards for the proposed work and completion dates.

2.    Provide informational signage to inform guests that work is underway and direct guest away from the construction area.

3.    Renovate several rooms to show guests and potential customers what they can expect in the future.

12
Hanford Motel Lodge
Hanford, CA

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR.  ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

This Punchlist identifies items that require action due to meet the Franchisor's standards.  The
Franchisor does not warrant that completion of the items on this Punchlist will cause the converting
facility to be in compliance with any applicable federal, state, local codes, ordinances or regulations.
You (and your architect, contractor and engineer, if applicable) are solely responsible for
conforming the Facility to the requirements of federal, state and local codes, ordinances and
regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on the
date specified.  The owner is responsible for meeting all Franchisor Standards.  All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist.  Note, that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry standards
of the Franchisor.  Also, this Punchlist may become null and void if the property does not enter the
System within 180 days after the punchlist date or as otherwise specified by the license (franchise)
agreement.

**This Punchlist is subject to revision by the Franchise Review Committee and should not be
considered to be final until the License Agreement for the inspected facility is executed by
the Company.**

NOTE:  Any item on this Punchlist that is not required to be completed prior to opening as a Super
8 Motel will continue to be evaluated for appearance and condition during all Quality Assurance
inspections conducted before the date when completion is required.

Signed: _____   Date: _9 - 19 . 0 7_

Print Name: _JAGDISH   PATEL_

**COMPLIMENTARY CONTINENTAL BREAKFAST**



*SuperStart®*

A.   Breakfast Requirements:

1.   Coffee Requirements:
   - Fresh brewed regular coffee; and
   - Fresh brewed decaffeinated coffee

2.   Juice Requirements:
   - 100% orange juice and one additional fruit juice – individual 6.75 oz containers, machine dispenser or pitcher with ice tube permitted

3.   Tea Requirements:
   - Tea bags, regular and decaffeina, d
   - Hot water

4.   Beverage Options Available in Addition to Coffee, Tea and Juice
   - Hot Chocolate – individual packets
   - Premixed Chocolate Milk – individual ½ pint or pint containers

5.   Milk – individual ½ pint or pint containers of 2%, or refrigerated machine dispensed 2%, or whole and skim milk (Both) may be used in place of 2% Milk

6.   Beverage Condiment / Supply Requirements:
   - Creamers: portion controlled half & half creamers and a portion controlled non-dairy creamer. Shelf stable half & half is acceptable. Flavored creamers in addition to regular creamers are acceptable.
   - Sugar – individual packets
   - Sugar substitute – individual packets; examples includes Sweet & Low®, Equal®, Splenda® etc.
   - Stir sticks – wooden or plastic; spoons are an acceptable alternative
   - Napkins – individual, minimum cocktail size (4" minimum)
   - Coffee cups – minimum 8 oz disposable. Coffee cups may be used for dispensed juice. Disposable juice cups, minimum 4 oz capacity, wax, plastic or foam, are an acceptable addition to the coffee cup.
   - Coffee cup lids

## COMPLIMENTARY CONTINENTAL BREAKFAST CONTINUED



**SuperStart®**

Note, both regular and decaffeinated coffee standing in excess of one hour must be provided in airpots, otherwise brewed fresh regularly. Additionally, instant coffee, coffee bags and/or liquid coffee concentrate are not permitted.

B.   Food Requirements:

  1.   Two Baked Goods to be chosen from:
  
  a.   One non-sweet – Bagels, English Muffins, or Corn or Bran Muffins to be served with:
  -   Butter or margarine, portion controlled (PC), individually wrapped, jelly/jam and cream cheese if bagel option chosen (portion controlled)
  
  b.   One sweet – Danish, Blueberry Muffins, Sweet Rolls or Donuts
  
  c.   Minimum 5", round disposable plates and disposable knives required with this option.

  2.   Ready-to-eat cold cereals required:
  
  a.   Instant oatmeal, such as Quaker® Instant Oatmeal
  
  b.   Assorted cereal bowl packs or a minimum of 2 types of nationally recognized branded bulk cereal to be chosen from:
  - Adult – Examples include Kellogg's Raisin Bran®, Kellogg's Special K®, Kellogg's Low Fat Granola
  - Kids – Examples include Kellogg's Frosted Flakes® or Kellogg's Fruit Loops®
  - Minimum 6-inch, round disposable bowls (if bowl packs not used) and disposable soup spoons

  2.   Food Options Available in Addition to Above:
  - Biscuits and Gravy
  - Breakfast Bars
  - Breakfast Sandwiches (microwaveable)
  - Chocolate Milk (individually served)
  - Flavored Coffee & Tea
  - Fruit –Fresh or Frozen
  - French Toast (portion controlled syrup)
  - Hard Boiled Eggs
  - Honey (portion controlled)

**COMPLIMENTARY CONTINENTAL BREAKFAST CONTINUED**



*SuperStart®*

- Hot Chocolate (portion controlled)
- Instant Oatmeal/Grits
- Peanut Butter (portion controlled)
- Toast Bar
- Waffles/Pancakes (portion controlled syrup)
- Yogurt (portion controlled)

C.    Equipment Requirements:

1.    SuperStart® wall sign – 15" x 22"

2.    Beverages:
   a.    Coffee and Tea must be provided in one of three ways:
   1.    Airpots – 4 total: two regular, one decaf and one hot water in an airpot rack with appropriate tags to identify contents.
   2.    Carafes – 4 total: two regular, one decaf and one hot water with appropriate tags to identify contents
   3.    Minimum three burner coffee machine, with or without plumbing, UL approved with auto-shutoff feature. Minimum of three pots, one pot for regular, one pot for decaf and one pot for hot water
   4.    Fresh brewed, single serve machine with regular, decaf and hot water options.
   b.    Juice must be provided in one of four ways:
   1.    One or two valve juice dispenser, depending on number of juices provided
   2.    Carafes – to pour dispensed product where dispenser is installed in back of house
   3.    Tabletop chiller – for juice boxes or carafes. Chiller may be a 10" diameter white or black round plastic tub 8" high or a 13" diameter aluminum display tub with silver wire stand.
   4.    Pitcher with ice tube, 3.3 liter with smooth sides for juice if dispenser, carafes or individual containers not used
   c.    Tea bags must be provided in 3" x 6" x 2" silver basket.

## COMPLIMENTARY CONTINENTAL BREAKFAST CONTINUED



***SuperStart®***

    d.    Milk, ½ pint or pint option, must be provided in tabletop chiller and may share juice chiller. Chiller may be a 10 " diameter white or black round plastic tub 8" high or 13" diameter aluminum display tub with silver wire stand. The same chiller may be used for both juice boxes and milk cartons.

    3.    Foods:

        a.    Medium 3-tier silver basket for Breakfast Bar option

        b.    3 –tier 6"L x 8"D x 24-1/2"H silver wire basket display with 3 glass ½ gallon Hex canisters 5" diameter x 8-1/8"H with metal covers for sugars, stirrers, creamers, etc.

        c.    One 2-tier silver 12" round display with two plates and two dome covers for baked goods option. Dome covers are optional if individually wrapped baked good items are provided.

        d.    Clear 9" long tongs for baked goods option unless prohibited by local codes, at which time wax paper tissues must be provided

        e.    2-tier silver platter display with 12" round clear acrylic discs for hand held fruit if provided

        f.    Disposable trays, not paper or cardboard, optional

        g.    One commercial grade bagel slicer, such as Bagel Biter™, optional

D.    Other:

        a.    Coordinating décor, may include silk flowers, plants, artwork, etc.

        b.    Coordinated trash receptacle, lid recommended

        c.    Disposable gloves required

        d.    Other display equipment than the silver wire basket motif may be used with prior written approval

## Furniture and Fixture Requirements

    1.    Counter size for the SuperStart® tier must be a minimum of 12ft long, 30" deep.

    2.    Seating is required. Café type tables and chairs recommended. If café chairs are not used, seating must have upholstered seats and backs. Vinyl permitted for breakfast area chairs only.  Banquet tables are not permitted.

    3.    Banquet, "Stacking",  Plastic, guestroom furniture is not permitted.

## COMPLIMENTARY CONTINENTAL BREAKFAST CONTINUED


**SuperStart®**

### *Furniture and Fixture Requirements  Continued*

4.  If the breakfast area is not a separate room and the area must be provided in a lobby with restricted space, the property must provide the breakfast in a decorated area matching lobby decor and furnishings. Noise levels in the breakfast area should be addressed through the use of dividers, plants and/or doors if possible.

5.  Super 8 recommends that the breakfast area be located in a separate breakfast/hospitality area immediately adjacent to the lobby. If a separate area is used, the area should meet the following requirements:

    -   Lighting should be controlled in order to produce varied effects at different times of the day (dimmer switches and window coverings are recommended methods).

    -   The furnishing, fixtures and equipment must be color coordinated and of subtle tones. Legal Requirements must be observed at all times. The buffet area must be permanent fixture, finished with a solid surface, Formica or tile top and under-the-counter cabinets.

    -   Seating area should meet occupancy demands at maximum periods. A minimum of seating equal to 1/4 (one fourth) of the total number of guestrooms. Less seating may be acceptable with prior company approval. Seating must be accessible to persons with disabilities, including persons who use wheelchairs. Please refer to the property's local building code requirements.

    -   The décor must be coordinated and pleasing to the eye. The breakfast room/hospitality area must include a minimum of one 24" color television with closed captioning operation. It is recommended that the television be turned to an all news channel when on. A nationally recognized newspaper, such as USA Today®, is recommended. Silk flowers, wall hangings, wall décor and/or live plants should be utilized to create a relaxing atmosphere.

**SUPER 8 MOTELS, INC.**
**SCHEDULE C**

**January 2007**

<u>System Assessment Fee</u>

The System Assessment Fee is equal to three percent (3%) of Gross Room Sales, and is paid into the Advertising and Reservation Fund. The System Assessment Fee is a recurring, non-refundable payment. All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period. Notwithstanding the above, we may increase the System Assessment Fee you pay upon 60 days advance written notice, effective at any time on or after the tenth (10th) anniversary of the Effective Date of this Agreement, as part of a Chain-wide increase in System Assessment Fees we implement in our sole discretion to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs. We may increase System Assessment Fees on a Chain-wide basis before the tenth anniversary of the Effective Date but such Fees will not begin to accrue at the increased rate until the tenth anniversary of the Effective Date.

<u>Additional Fees</u>

A.    <u>Mandatory Marketing Program Charge</u>

We charge a Mandatory Marketing Program Charge for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Mandatory Marketing Program Charge is up to 5% of the Gross Room Sales accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

B.    <u>GDS and Internet Booking Fees</u>

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. The GDS Fee described in Section 7 is $5.15 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $4.15 per reservation booked through sources other than GDS powered websites, our Chain website, or our direct connection to expedia.com or hotels.com. We do not charge any fees for reservations booked through our Chain website or through our direct connection to expedia.com or hotels.com. GDS and Internet-originated reservations also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation,

33

you will not be charged the applicable fee.

C.    Other Additional Fees or Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Sales generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .5% of commissionable revenue. Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs. You may elect not to receive reservations from either the GDS or Internet websites, other than the Chain's website, by giving us 60 days advance written notice. We will remove the Facility from participation in both channels. However, you must pay all fees and commissions incurred for reservations booked through the GDS or Internet before deactivation. You may reactivate the Facility's listing through such channels once by paying us a reactivation charge of $100.00, after which you may not deactivate again during the Term of your License. Your participation in the GDS and Internet must be for either both or neither distribution channel.

We also charge you an annual website maintenance fee of $36.00 to maintain the Facility's web pages on the Chain's website. We may charge additional fees for creating or modifying the Facility's web pages or performing other services related to Internet marketing.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the

34

SUPEXC1
216608 03/07

distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and System Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of certain affinity groups and organizations at your Facility if you participate in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

D.     Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish, we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

We may increase or adjust any of the Additional Fees to cover increases in their allocated costs and may add new fees and charges for new services and programs at any time upon not less than 60 days notice.

SUPEXC1
216608 03/07

# EXHIBIT B



Wyndham Hotel Group
Franchise Administration
1 Sylvan Way
Parsippany, NJ 07054
800 880 9445 fax
April 27, 2007

Mr. Jagdish & Hansa Patel
5749 Lacey Blvd
Hanford, CA 93230

**Name Correction – Hanford, CA- site #19459-69821**

Dear Mr. and Mrs. Patel:

By way of separate letter you have received the proposed License Agreement and related agreements ("Agreements") for the above referenced facility.  We have discovered that the names listed on your Grant Deed is Jagdish P. Patel and Hansa C. Patel. However, the Agreements were prepared identifying you as Jagdish Patel and Hansa Patel. Simply to avoid any confusion or ambiguity, this letter confirms that all references to Jagdish Patel and Hansa Patel shall be deemed instead to be Jagdish P. Patel and Hansa C. Patel.

Please confirm your agreement to the terms of this letter by acknowledging below and returning this letter to me via fax number 800 643 2107.

Very Truly Yours,
Super 8 Motels, Inc.

Richard M. Saltzman
Vice President
Franchise Administration

The terms and conditions of this letter are hereby agreed to and accepted by the Franchisee effective as of
_5-2-07_, 2007.

By: _JAGDISH P PATEL_
Jagdish P. Patel

By: _HP Patel_
Hansa C. Patel

       

## Bush, Jessica

**From:**    QuantumView [QuantumViewNotify@ups.com]
**Sent:**    Tuesday, October 23, 2007 2:58 PM
**To:**      Bush, Jessica
**Subject:**  UPS Delivery Notification, Tracking Number 1Z22445X0198351426

***Do not reply to this e-mail. UPS and Wyndham Hotel Group - 1 Sylvan will not receive your reply.

**At the request of Wyndham Hotel Group - 1 Sylvan, this notice is to confirm that the following shipment has been delivered.**

### Important Delivery Information

**Delivery Date / Time:** 23-October-2007 / 11:12 AM
**Delivery Location:** FRONT DESK
**Signed by:** PATEL

### Shipment Detail

**Ship To:**
Jack Patel
Jack Patel
918 E. Lacy Blvd.
HANFORD
CA
932304739
US

**UPS Service:**       NEXT DAY AIR
**Weight:**            2.0 LBS

**Tracking Number:**   1Z22445X0198351426
**Reference Number 1:** 006-5069

This e-mail contains proprietary information and may be confidential. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this message is strictly prohibited. If you received this message in error, please delete it immediately.

This e-mail was automatically generated by UPS e-mail services at the shipper's request. Any reply to this e-mail will not be received by UPS or the shipper. Please contact the shipper directly if you have questions regarding the referenced shipment or you wish to discontinue this notification service.

    2H2H278Zqa7rC.88Pvlum68c-RIwKcl3RZW5KRPK.uvZ3

10/23/2007

UPS CampusShip: Shipment Receipt



*Retrieved Agents* (handwritten)

# Shipment Receipt

(Keep this for your records.)

**Transaction Date** 22 Oct 2007

## Address Information

| Ship To: | Shipper: | Ship From: |
|---|---|---|
| Jack Patel | Wyndham Hotel Group - 1 Sylvan | Wyndham Hotel Group - 1 Sylvan |
| Jack Patel | Franchise Administration | Jessica Bush |
| 000-000-0000 | 973-753-8830 | 973-753-8830 |
| 918 E. Lacy Blvd. | 1 Sylvan Way | 1 Sylvan Way |
| HANFORD CA 93230-4739 | PARSIPPANY NJ 07054 | Parsippany NJ 07054 |

## Shipment Information

| | | |
|---|---|---|
| **Service:** | UPS Next Day Air | |
| *Guaranteed By: | 12:00 PM, Tues. 23 Oct. 2007 | |
| **Quantum View Notify** SM **1:** | jessica.bush@wyndhamworldwide.com | |
| Delivery | | |
| **E-mail Failure Notification:** | jessica.bush@wyndhamworldwide.com . . . . . . . . . . . . . . . . . | No Charge |
| **Quantum View Notify** SM | Total: . . . . . . . . . . . . . . . . . . . . . . | No Charge |
| **Fuel Surcharge:** | . . . . . . . . . . . . . . . . . . . . | **5.07 |
| **Shipping:** | . . . . . . . . . . . . . . . . . . . | **36.20 |

## Package Information

**Package 1 of 1**
Tracking Number:       1Z22445X0198351426
Package Type:          UPS PAK
Actual Weight:         2.0 lbs
Billable Weight:       2.0 lbs
Reference # 1:         006-5069

## Billing Information

**Bill Shipping Charges to:**        Shipper's Account 22445X

**Total:**        **All Shipping Charges in USD**        **41.27

**Note:** Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

** Detailed information on fuel surcharges is also available.

**Responsibility for Loss or Damage**
Unless a greater value is recorded in the declared value field as appropriate for the UPS shipping system used, the shipper agrees that the released value of each package covered by this receipt is no greater than $100, which is a reasonable value under the circumstances surrounding the transportation. If additional protection is desired, a shipper may increase UPS's limit of liability by declaring a higher value and paying an additional charge. UPS does not accept for transportation and shipper's requesting service through the Internet are prohibited from shipping packages with a value of more than $50,000. The maximum liability per package assumed by UPS shall not exceed $50,000, regardless of value in excess of the maximum. Claims not made within nine months after delivery of the package (sixty days for international shipments), or in the case of failure to make delivery, nine months after a reasonable time for delivery has elapsed (sixty days for international shipments), shall be deemed waived. The entry of a C.O.D. amount is not a declaration of value for carriage purposes. All checks or other negotiable instruments tendered in payment of C.O.D. will be accepted by UPS at shipper's risk. UPS shall not be liable for any special, incidental, or consequential damages. All shipments are subject to the terms and conditions contained in the UPS Tariff and the UPS Terms and Conditions of Service, which can be found at www.ups.com.

# EXHIBIT C



# WYNDHAM

### HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

March 6, 2014

<u>**VIA 2 DAY DELIVERY METHOD**</u>

Mr. Jagdish Patel
918 East Lacey Blvd.
Hanford, CA 93230

**Re:   NOTICE OF QUALITY ASSURANCE DEFAULT** relating to **Super 8® Unit
#19439-69821-1 located in Hanford, CA (the "Facility")**

Dear Mr. Patel:

I write on behalf of Super 8 Worldwide, Inc., successor in interest to Super 8 Motels, Inc., ("we,"
"us," or "our") regarding the Franchise Agreement dated August 14, 2007, between Jagdish Patel
and Hansa Patel, (collectively,"you" or "your") and us (the "Agreement"). We write to give you
formal notice that you are in default under the Agreement.

The Agreement requires you to maintain the Facility according to System Standards.  Our
Quality Assurance Consultant conducted an inspection of the Facility on February 26, 2014. The
Facility received a failing score of 59.82%-F.  We will re-inspect the Facility after at least
forty-five (45) days from the date of this Notice.  If the Facility does not receive a passing
quality assurance score at this re-inspection, the Agreement may be subject to termination.
Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility.

Additionally, we would like to take this time to advise you that the Facility has received two
consecutive Quality Assurance ("QA") scores above 200.  Specifically, the Facility received a score
of 290-D during the QA inspection conducted on January 20, 2010 and it received a score of 239-D
during the QA inspection conducted on November 17, 2010.  These scores are above the maximum
score necessary to retain your Additional Termination Right as set forth in Section 18.2 of the
Agreement. Accordingly, your Additional Termination Right is automatically terminated.



This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system.

Please be advised that a copy of the QA Evaluation report has been provided to you at the time of the inspection.

We hope you will take this opportunity to resolve your quality assurance default. If you have any questions regarding your default or how it can be timely cured, please contact your Operation Support Desk at (888) 575-4822.

Sincerely yours,

Suzanne Fenimore
Senior Director
Contracts Compliance

cc:     John Valletta
        Tracy Ripa
        Michael Piccola
        Joe Maida

 **Shipment Receipt**

**Transaction Date:** 06 Mar 2014      **Tracking Number:**      1Z22445X0293772318

---

**1**   **Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Jagdish Patel | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Jagdish Patel | Elena Danishevsky | Elena Danishevsky |
| 918 E. LACEY BLVD. | 22 Sylvan Way | 22 Sylvan Way |
| HANFORD CA 032304739 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| Telephone:(559) 582-1738 | Telephone:973-753-7236 | Telephone:973-753-7236 |

---

**2**   **Package Information**

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1. | Letter | UPS Letter | | Reference # 1 - 006-1696 |
| | | | | Reference # 2 - |
| | | | | Reference # 3 - |

---

**3**   **UPS Shipping Service and Shipping Options**

| | |
|---|---|
| Service: | UPS 2nd Day Air |
| Guaranteed By: | End of Day Monday, Mar 10, 2014 |
| Shipping Fees Subtotal: | 22.87 USD |
|     Transportation | 20.70 USD |
|     Fuel Surcharge | 2.17 USD |

---

**4**   **Payment Information**

Bill Shipping Charges to:      Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

| | |
|---|---|
| Total Charged: | 22.87 USD |
| Negotiated Total: | 5.65 USD |

**Note:** Your invoice may vary from the displayed reference rates.
\* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT D



**WYNDHAM**

**HOTEL GROUP**

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

June 30, 2014

**VIA 2 DAY DELIVERY METHOD**

Mr. Jagdish Patel
918 East Lacey Blvd.
Hanford, CA 93230

Re:   **NOTICE OF TERMINATION** of Franchise Agreement dated August 14, 2007, (the
      "Agreement") between Jagdish Patel and Hansa Patel, (collectively, "you" or "your") and
      Super 8 Worldwide, Inc., successor in interest to Super 8 Motels, Inc., ("we", "our" or "us") for the
      Super 8® System Unit #19439-69821-1 located in Hanford, CA (the "Facility")

Dear Mr. Patel:

We write to give you formal notice of the termination of the Franchise granted under the Agreement to
operate the Facility as part of the Super 8 System (the "Notice"). This termination is a result of your failure
to cure your default under the Agreement, due to your failure to satisfy the required quality standards. The
termination of your Agreement is effective as of the date of this Notice (the "Termination Date").

Because the Agreement has terminated, you must perform your post-termination obligations such as the
removal of all items that display or refer to the Super 8 brand at the Facility. The de-identification
procedures are specified in the attachment to this Notice. These de-identification procedures must be
completed within ten (10) days from the Termination Date.

You must also pay us the full amount of all Recurring Fees and other charges due under the Agreement
through the date you complete the de-identification process. We estimate that, as of the Termination Date,
you owe us $9,188.13 in Recurring Fees. This amount is described in more detail in the attached itemized
statement. Additionally, you must pay us Liquidated Damages of $41,000.00 as specified in Section 18.1
of the Agreement. You must also pay de-commission fees of $326.00 for the termination of the
Connectivity Equipment Lease and Services Addendum (the "Addendum"). The Addendum
has also terminated on the Termination Date.

Please know that, because the Agreement has terminated, you also have lost the right to continue to use
the seamless interface version of your property management system. You must make arrangements with
the software vendor for a new license to use the property management system. If the Facility has
WynGuest system installed, please be advised that due to the termination you will have no functionality
from the system. Should you wish to continue using an independent version of the software, please
contact Sabre at 877-520-3646. If your property is planning to migrate to another property management
system, please contact your provider to expedite the installation. If you would like to inquire about the
data maintained in the system, please contact Hotel Technology Client Support at 506-646-2521 to obtain
reporting of that data.



Mr. Jagdish Patel
June 30, 2014
Page Two

If within the ten (10) day period described above, you do not timely remove the exterior signage which bears the Super 8 name and Marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us. If you object to the removal of the signage by our independent contractor, you must notify us within ten (10) days of the Termination Date.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility.

If you have any questions regarding your obligations under this Notice, please contact Charlene Martin, Senior Manager of Settlements, at (973) 753-7602.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosures

cc:     John Valletta
        Larry Geer
        Charlene Martin
        Joe Maida
        Michael Piccola

# ITEMIZED STATEMENT

Report Date: 30-Jun-2014



| As of Date (DD-MMM-YYYY) | : | 30-Jun-2014 |
|---|---|---|
| Customer No | : | 19439-69821-01-SUP |
| Category Set | : | |
| Category Group | : | |
| Group No | : | |
| Bankruptcy | : | No Bankruptcy Sites |
| Disputed | : | No |
| Finance Charges Included | : | Yes |

| Customer No | : | 19439-69821-01-SUP |
|---|---|---|
| Address | : | 918 E Lace Blvd,Harford,CA,93230,US |
| As of Date | : | 30-Jun-2014 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| JAN-2013 | 10655011 | 01/16/2013 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 24.56 | 184.56 |
| | 10655814 | 01/23/2013 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 36.39 | 196.39 |
| | 10656077 | 01/30/2013 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 37.68 | 197.68 |
| | 10657560 | 01/30/2013 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 37.68 | 197.68 |
| | | | Sub Total: | | 640.00 | 0.00 | 136.31 | 776.31 |
| MAY-2013 | 10673192 | 05/23/2013 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 28.64 | 188.64 |
| | 10672130 | 05/23/2013 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 28.64 | 188.64 |
| | | | Sub Total: | | 320.00 | 0.00 | 57.28 | 377.28 |
| JAN-2014 | 10716722 | 01/09/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 10.16 | 170.16 |
| | 10717385 | 01/09/2014 | GUEST SATISFACTION | | 59.40 | 0.00 | 3.77 | 63.17 |
| | | | Sub Total: | | 219.40 | 0.00 | 13.93 | 233.33 |
| MAR-2014 | 30898769 | 03/11/2014 | O/A REINSPECTION | | 1,900.00 | 0.00 | 62.70 | 1,962.70 |
| | | | Sub Total: | | 1,900.00 | 0.00 | 62.70 | 1,962.70 |
| APR-2014 | 30910278 | 04/30/2014 | O/A REINSPECTION | | 1,900.00 | 0.00 | 15.20 | 1,915.20 |
| | | | Sub Total: | | 1,900.00 | 0.00 | 15.20 | 1,915.20 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| MAY-2014 | TA0470369 | 05/20/2014 | T/A COMMISSIONS | | 8.18 | 0.00 | 0.00 | 8.18 |
| | 1470369 | 05/20/2014 | GDS & INTERNET BKGS | | 5.55 | 0.00 | 0.00 | 5.55 |
| | 26321328 | 05/22/2014 | WYNREWARDS CRDT | | -70.00 | 0.00 | 0.00 | -70.00 |
| | 26320997 | 05/22/2014 | WYNREWARDS BONUS | | 15.00 | 0.00 | 0.00 | 15.00 |
| | 26322793 | 05/22/2014 | WYNREWARDS 5% | | 196.09 | 0.00 | 0.00 | 196.09 |
| | 26321048 | 05/22/2014 | WYNREWARDS BONUS | | 15.00 | 0.00 | 0.00 | 15.00 |
| | 42801842 | 05/31/2014 | 5715A-HughesNet VSAT | | 160.00 | 12.00 | 0.00 | 172.00 |
| | 42900103 | 05/31/2014 | Actual-1215A-ADVERTISING | | 965.76 | 0.00 | 0.00 | 965.76 |
| | 42881991 | 05/31/2014 | 5098A-WYNGUEST SW MAINT | | 154.05 | 11.55 | 0.00 | 165.60 |
| | 42858757 | 05/31/2014 | Actual-1000A-ROYALTY FEE | | 1,770.56 | 0.00 | 0.00 | 1,770.56 |
| | | | Sub Total: | | 3,220.19 | 23.55 | 0.00 | 3,243.74 |
| JUN-2014 | 26327086 | 06/22/2014 | WYNREWARDS BONUS | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 26328112 | 06/22/2014 | WYNREWARDS 5% | | 288.01 | 0.00 | 0.00 | 288.01 |
| | 26327927 | 06/22/2014 | WYNREWARDS CRDT | | 15.00 | 0.00 | 0.00 | 15.00 |
| | 26328880 | 06/22/2014 | WYNREWARDS CRDT | | -70.00 | 0.00 | 0.00 | -70.00 |
| | 1477115 | 06/25/2014 | GDS & INTERNET BKGS | | 29.75 | 0.00 | 0.00 | 29.75 |
| | TA0477115 | 06/25/2014 | T/A COMMISSIONS | | 20.16 | 0.00 | 0.00 | 20.16 |
| | TR0477115 | 06/25/2014 | TMC/ CONSORTIA | | 5.50 | 0.00 | 0.00 | 5.50 |
| | T20407015 | 06/25/2014 | T/A COMM SERVICE CHG | | 3.55 | 0.00 | 0.00 | 3.55 |
| | 42909917 | 06/30/2014 | 5098A-WYNGUEST SW MAINT | | 154.05 | 11.55 | 0.00 | 165.60 |
| | 42910518 | 06/30/2014 | 5715A-HughesNet VSAT | | 160.00 | 12.00 | 0.00 | 172.00 |
| | | | Sub Total: | | 656.02 | 23.55 | 0.00 | 679.57 |
| | | | Grand Total: | | 8,855.61 | 47.10 | 285.42 | 9,188.13 |

Requested By: Yelena Danishevsky

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following within 10 days after the Termination Date:**

1.     Remove, replace or cover with an opaque cover the primary Facility signage.

2.     Remove all interior signage that contains Super 8 Marks.

3.     Change advertising billboards to remove Super 8 Marks.

4.     Stop answering Facility telephone as Super 8 guest lodging facility.

5.     Remove Super 8 name and Marks from any domain name, advertising and brochures.

6.     Return to us all confidential operations and training manuals.

7.     Remove the Super 8 name and Marks from the following items:

> Stationery, pads and pens
> Directories and brochures
> Business cards
> Folios and registration cards
> Do-not-disturb cards
> Comment cards
> Telephone plates
> Telephone dialing instructions
> TV channel ID plates
> Rate/law cards
> Door signage
> Soap/shampoo
> Key tags
> Credit card imprinter
> Laundry bags
> Name tags/uniforms
> Ice buckets/trays
> Ashtrays/matches
> Plaques
> Guest checks/receipts
> Menus

8.     Paint over or remove any distinctive Super 8 trade dress, paint schemes or architectural features.

9.     It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Super 8 facility.

10.    Our quality assurance inspectors will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

UPS CampusShip: Shipment Receipt

Page 1 of 1

 **Shipment Receipt**

**Transaction Date:** 30 Jun 2014      **Tracking Number:**     1Z22445X0291285821

## 1  Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Jagdish Patel | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| GM- Jagdish Patel | Elena Danlahevsky | Elena Danlshevsky |
| 918 E. LACEY BLVD. | 22 Sylvan Way | 22 Sylvan Way |
| HANFORD CA 932304739 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| Telephone:(559) 582-1736 | Telephone:973-753-7236 | Telephone:973-753-7236 |

## 2  Package Information

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1. Letter (Letter billable) | UPS Letter | | Reference # 1 - 006-1696 Reference # 2 - Reference # 3 - |

## 3  UPS Shipping Service and Shipping Options

| | |
|---|---|
| Service: | UPS 2nd Day Air |
| Guaranteed By: | End of Day Wednesday, Jul 2, 2014 |
| Shipping Fees Subtotal: | 22.87 USD |
|     Transportation | 20.70 USD |
|     Fuel Surcharge | 2.17 USD |

## 4  Payment Information

Bill Shipping Charges to:      . Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

| | |
|---|---|
| **Total Charged:** | **22.87 USD** |
| **Negotiated Total:** | **5.65 USD** |

Note: Your invoice may vary from the displayed reference rates.
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.